UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| **CHRISTINE LYNN JONES,** | : | **Case No.  1:08-CV-1432** |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| **CITY OF BRUNSWICK,** *et al*., | : | **MEMORANDUM & ORDER** |
| **Defendants.** | : | |


Before the Court is Defendants' Motion for Summary Judgment (Doc. 53), in which they argue that none of the Plaintiff's claims present disputed issues of fact for a jury.  Plaintiff Christine Lynn Jones opposes this motion (Doc. 54) and the Defendants have filed a reply to her opposition (Doc. 57).[1] For the following reasons, having fully considered the parties' briefs and attached exhibits, Defendants' Motion for Summary Judgment (Doc. 53) is **GRANTED IN PART AND DENIED IN PART**.

## I.  BACKGROUND

This lawsuit arises under 18 U.S.C. § 1983.  Although the Plaintiff asserts a variety of constitutional violations, the factual basis underlying her complaint is straightforward.  She contends that her constitutional rights were violated when two of the individually named defendants ordered her to remove her outer layer of clothing prior to taking her "booking photo" because she was wearing only underwear below that clothing.  She also argues that she was denied the right to make a phone call while in custody.

---

[1] One of the individual defendants in this case is City of Brunswick Police Officer Jeffery Jones, whereas the Plaintiff is Christine Lynn Jones.  There is no apparent relationship between the two.  For clarity, the Court will refer to Miss. Jones as "the Plaintiff," and Mr. Jones as "Officer Jones."

With respect to this first claim, the Defendants do not challenge the Plaintiff's central version of events or asserted legal standard; they challenge whether the clothing in which she was photographed properly can be described as underwear.  With respect to the second claim, the Defendants argue that video evidence shows that the Plaintiff was offered a phone call.

## II.  STANDARD OF REVIEW

Defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Under Rule 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

In reviewing summary judgment motions, this Court must view evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases, the Court will decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Anderson*, 398 U.S. at 252.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the non-moving party's claim.  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citation omitted); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 & n.12 (6th Cir. 1989).  The moving party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential

2

element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In response, if the moving party establishes the absence of a genuine issue of material fact, to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citation omitted).  In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"; rather, "Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact."  *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted); *see also Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008) (citation omitted).  Moreover, the non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Barr v. Lafon*, 538 F.3d 554, 574 (6th Cir. 2008).

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict – whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." (emphasis in original) (internal quotations omitted)).

### III. RELEVANT FACTS

The vast majority of the relevant facts are recorded on videotape (*see* Doc. 54-2; Doc. 54-3), allowing the Court to view first-hand the events in question.  There is, moreover, not really any dispute between the parties as to what happened; the parties only dispute how those events should be characterized.  To the extent a rational trier of fact could agree with the Plaintiff's characterization of these facts, of course, the Court must adopt that characterization for purposes of this motion.  This general rule is particularly appropriate here where, as discussed below, some of the Defendants' evidentiary submissions contradict not only each other, but also the video evidence.[2]

#### A. The Plaintiff's Arrest

On May 26, 2007, City of Brunswick Police Officer Jeffrey Jones ("Officer Jones") observed the Plaintiff driving erratically and without headlights.  (Doc. 53-1 at ¶¶ 4-5.)  When he stopped the Plaintiff, he detected "a moderate odor of alcohol coming from [her] vehicle and [she] admitted she was drinking."  (*Id.* at ¶ 7.)  Officer Jones administered "standard field sobriety tests," which the Plaintiff failed.  (*Id.* at ¶¶ 8-9.)  At this point, Officer Jones "visually inspected her outer clothes," and placed her into his vehicle.  (Doc. 54-10 at 5:19-6:2.)  He then transported the Plaintiff to the Brunswick Police Department (Doc. 53-1 ¶ 10), where she was charged with two misdemeanor offenses relating to driving under the influence of alcohol, and two traffic violations.  (Doc. 53-2 at 6.)

The Plaintiff, for her part, admits that she was drunk when she was stopped by the police.  (Doc. 53-10 at 23:2-9.)

---

[2] As discussed below, the Plaintiff also seems to ignore the video evidence when pushing her claim that she was denied the right to make a phone call while detained.

**B.  The Search**

**1.  The Procedure Employed During Booking**

Once at the Brunswick Police Department, Officer Jones was joined by Officer Jeffrey Smith ("Officer Smith"), who assisted with booking procedures.  (Doc. 54-9 at 5:4-6.)  Officer Jones and Officer Smith collected some basic information from the Plaintiff and then asked her to provide a blood sample.  (*Id.* at 5:7-6:6.)[3]  Throughout this process, the Plaintiff was wearing sweatpants and a fitted hooded-shirt made of light-weight material (a "hoodie").  (Doc. 54-1 at ¶ 8; Doc. 54-2.)[4]  The Defendants do not claim that the Plaintiff was uncooperative, disrespectful, or threatening (i.e., they claim no need to search her out of particularized concern for their safety) and she does not appear to be any of these thing in the video – in fact, the video reveals that, prior to asking her to remove her hoodie, the officers appear to have left her alone, unhandcuffed, and unsupervised.  (*See* Doc. 54-2.)

After raising the camera to take the Plaintiff's booking photograph, Officer Smith asked the Plaintiff to remove her hoodie.  (Doc. 54-1 at ¶ 8; Doc. 54-2.)  Neither Officer Smith nor Officer Jones asked the Plaintiff what she was (or was not) wearing underneath (Doc. 54-1 at ¶ 13), and under her hoodie, in fact, the Plaintiff was wearing a lace-trimmed camisole and bra.  (Doc. 54-1 at ¶ 5; Doc. 54-3.)  She collectively considered this to be her underwear.  (Doc. 54-1 at ¶¶ 11-12.)[5]  The female officer

---

[3] Officer Jones and Officer Smith jointly participated in the booking process.  (*See* Doc. 54-3; Doc. 54-9 at 5:4-7:19; 54-10 at 6:17-7:5.)  Presumably for this reason, both parties implicitly suggest that there is no difference in the legal culpability, or lack thereof, between the two, and the Court finds no reason to depart from that suggestion at this time.

[4] During booking proceedings, the Defendants recorded that this was a "sweatshirt."  (Doc. 53-2.)  The Plaintiff has at times referred to this as a "hooded shirt" (Doc. 53-11 at 10:12), "hooded sweatshirt" (Doc. 54-1 ¶ 8), and "hoodie" (*id.*).  The Court believes that all four of these terms are reasonably accurate, but that the term "hoodie," most calls to mind the article of clothing at issue in this case.  (*See* Doc. 54-3)

[5] On reply, the Defendants accuse the Plaintiff of changing her testimony because she referred to this item of clothing as a "tank top" during her deposition, but a "camisole" in her affidavit.  (Doc. 57 at 2.)  This criticism is not well taken.  As an initial matter, although it would never have occurred to the Court to refer to this particular lace-trimmed garment as a "tank top," the words "tank top" and "camisole" have essentially the same denotative meaning – indeed, they are sometimes used together to

who would later perform a pat-down search of the Plaintiff had not arrived at the time the Plaintiff was asked to remove her hoodie; that officer arrived immediately after.  (Doc. 54-2.)

Officer Smith then took the Plaintiff's photograph from the middle of her torso.  In this picture, the Plaintiff is wearing only her camisole and bra.  (Doc. 54-9 at 6:7-24.)  The record shows that at least some other young women have been photographed by the City of Brunswick in camisoles, whereas at least some men have been photographed wearing somewhat bulky outerwear despite having t-shirts under that outerwear.  (*See* Doc. 54-4)  The Defendants do not dispute that booking photographs are part of the public record, available to any who request them.

Following the photograph, a female officer performed a pat-down search.  (Doc. 54-9 at 7:8-17.)  The Plaintiff was then allowed to wear her hoodie again.  (Doc. 53-1 at ¶ 37.)

### C.  The Plaintiff's Phone Call

Approximately half an hour after reaching the police station, the Plaintiff was offered a phone call, which she did not accept.  (Doc. 53-1 at ¶¶ 16-22; Doc. 54-3.)  The Plaintiff asserts that, after being placed in her holding cell, she requested a call repeatedly before being given one.  (Doc. 54-1 at ¶ 20-21.)  Approximately 45 minutes after being first offered a phone call, however, the Plaintiff was able to call her father.  (Doc. 53-1 at ¶¶ 25-26.)  Approximately 45 minutes after that, the Plaintiff was released into her father's custody.  (*Id*. at ¶ 28.)

---

form the word "camisole tank top."  The word "tank top," moreover, is not talismanic language that somehow would compel a jury to conclude that the article of clothing in question is outerwear.  *See St. Eve Int'l, Inc. v. United States*, 27 C.I.T. 758, 766 (Ct. Int'l Trade 2003) ("[C]ertain knit, tank-styled garments [are] classifiable as underwear . . . ."); *State v. Foran*, Case No. CR040216603, 2006 Conn. Super. LEXIS 3007, at *4 (Conn. Super. Ct. Oct. 5, 2006) ("[The] underwear set . . . consisted of a tank top and thong panties.").

## IV. THE DEFENDANTS' EVIDENTIARY SUBMISSIONS

The Defendants' evidentiary submissions are somewhat troubling, making it difficult for the Court to assume that a reasonable jury would credit the Defendants' description of events, and particularly difficult for the Court to conclude that the Defendants' version of events is the <u>only</u> version a reasonable jury could credit.

For instance, in his interrogatory responses, Chief of Police Carl DeForest states that there are no unwritten policies or procedures by which Brunswick police officers are bound:

> QUESTION:   What policies and procedures are not contained in Brunswick's written policies and procedures?  How are these policies and procedures explained to officers and staff?

> ANSWER:     None.  The City of Brunswick Police's policies are written and provided to all officers.

(Doc. 54-5 at 4.)   Yet, Officer Smith's interrogatory answers assert that the Plaintiff was asked to remove her hoodie pursuant to the City of Brunswick's established policies and procedures (Doc. 54-5 at 3), even though the written policies make no mention of a requirement that the police remove outerwear prior to performing a pat-down search (Doc. 53-7).[6]

Other interrogatory answers also leave the Defendants open to credibility attacks.   Each defendant reports that he received no assistance completing the interrogatories posed to him.  (*See* Doc. 54-5 at 2, 11, 20.)  This seems unlikely, however.[7]   To take but one example, Officer Jones, Officer

---

[6] While common sense indicates that a thorough pat-down search could not take place through a jacket or other particularly bulky clothing, Defendants' interrogatory responses claim that the City of Brunswick has an official written policy to that effect, which, based on the evidence before the Court, it does not.

[7] At his deposition, Officer Smith admitted that he discussed his answers with the Defendants' attorney, in contravention of his initial assertion to the contrary.  (Doc. 54-9 at 23:9-11.)  In his deposition, on the other hand, Officer Jones reasserted that he received no assistance whatsoever:

> QUESTION:   Did you talk to anybody about [the interrogatories]?

> ANSWER:     No.

> QUESTION:   When did you answer them? . . .

Smith, and Sergeant Szuter all refer to the Plaintiff's outerwear as a "sweater/jacket."  It is difficult to imagine that all three Defendants independently decided to use this atypical description, especially since it does not seem to describe what the Plaintiff was actually wearing.[8]  This is particularly so in context: for example, each officer began his answer to Interrogatory #8 as follows:

> Christina Jones was not asked to remove her sweater/jacket for the photograph. She was asked to remove her sweater/jacket by Officer Smith for the through pat-down search as required under the City of Brunswick Police policies and procedures.

(Doc. 54-5 at 3, 12, 21.)[9]  It is, of course, entirely acceptable for attorneys to draft interrogatory responses for their clients, *so long as their clients concede that fact*.[10]  This answer is also problematic because the Plaintiff *was* "asked to remove her [hoodie] for the photograph:" there is no other way to describe what happens in the videotape.  (*See* Doc. 54-4.)  The Plaintiff is seen in her hoodie for approximately four minutes and is only asked to remove it when Officer Smith raises the booking camera, which occurs prior to the arrival of the female officer for a pat-down search.  (Doc. 54-4.)  In other words, not only are the interrogatories problematic because the Defendants were not forthcoming

---

| | |
|---|---|
| ANSWER: | The night I got them. |
| QUESTION: | Where? |
| ANSWER: | In the roll call room at the police station. |
| QUESTION: | Was anyone else in the room with you? |
| ANSWER: | No. |

(Doc. 54-10 at 8:8-16.)

[8] It does appear that at least one company offers a "sweater-jacket" similar to, though heavier and looser-fitting than, the one worn by the Plaintiff on March 26, 2007 (*see* http://www.patagonia.com (last visited at 9:00am on March 10, 2010).  This does not alter the Court's basic analysis, however.

[9] Officer Jones' response does not include the word "thorough."  (Doc. 54-5 at 3.)

[10] The Court, for example, cannot credit Officer Smith's contention that he sometimes refers to himself in the third-person in his interrogatory answers because he was not "careful enough to use the same tense throughout the entire document."  (Doc. 54-9 at 5-7.)  It is much more likely that Officer Smith (or someone acting on his behalf) copied and pasted answers from some third source.  Again, the Court does not question how the interrogatories were prepared, only why the Defendants would have misdescribed the process.

as to whether they received assistance in completing them, they are also problematic because they are contradicted by the video evidence.[11]

Finally, a portion of the affidavits submitted by Chief DeForest and Sergeant Szuter are inappropriate to the extent that they purport to state legal conclusions.  The Court does not base its determination of whether the Defendants may have violated the Plaintiff's constitutional rights, for example, on the assertion made by the Defendants that they did not "violate any clearly established constitutional or statutory rights."  (Doc. 53-5 ¶ 10; Doc. 53-4 ¶ 10.)

## V.  ANALYSIS

All of the Plaintiff's claims arise against various law enforcement officials under 42 U.S.C. § 1983, which requires the Plaintiff to "establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law."  *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citations omitted).  The Defendants in this action do not dispute that they acted under color of state law during any of the relevant events – accordingly, the threshold question is simply whether the Plaintiff suffered a depravation "of a right secured by the Constitution or laws of the United States."  *Id.*

If a plaintiff can make such a showing, she must still show the propriety of recovery from any particular party.  *See Petty v. County of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007).  To the extent a plaintiff seeks recovery from an individual governmental official, such recovery is only proper if that official has both violated the plaintiff's "clearly established constitutional rights" and done so in a way that was "objectively unreasonable in light of [those] clearly established constitutional rights."  *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (*en banc*) (citation omitted); *see also Champion v. Outlook*

---

[11] The drafter of this answer may have intended to assert that Officer Smith's purpose in asking the Plaintiff to remove her hoodie was unrelated to the booking photograph and that it is only a coincidence that he asked her to remove that hoodie moments before taking her picture.  In light of the video evidence, even that assertion, standing alone, would be questionable.

*Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (citation omitted).[12]  When, on the other hand, a plaintiff seeks to recover from a municipality, there is no requirement that a particular right be "clearly established," but the plaintiff must then show that the municipality itself was the proximate cause of any deprivation.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 122, (1992); *Ford v. County of Grand Traverse*, 535 F.3d 483, 495-496 (6th Cir. 2008).

The Court will examine each of the Plaintiff's claims in turn.

**A.  The Alleged Fourth Amendment Violation**

**1.  Whether the Plaintiff Suffered a Depravation of a Constitutional Right**

The Fourth Amendment of the United States Constitution provides that "[t]he right of the people to be secured in their persons . . . against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. Amend. IV.  In other words, "the Fourth Amendment is violated when the government conducts an unreasonable search in an area where a person has a reasonable expectation of privacy." *Justice v. Peachtree City*, 961 F.2d 188, 191 (11th Cir. 1992); *see also J.P. v. Desanti*, 653 F.2d 1080, 1087 (6th Cir. 1981) (citing *Terry v. Ohio*, 392 U.S. 1, 8-9 (1968)).[13]

To determine whether the Plaintiff has suffered a deprivation, the Court must first inquire whether a misdemeanor arrestee has a reasonable expectation of privacy in her body.  Because she does, the next question is whether that reasonable expectation extends to misdemeanor arrestees clad only in underwear.  This question, too, is answered in the affirmative, so the Court must then ask whether a reasonable jury could consider the camisole in which she was photographed and searched to be underwear.  Finally, having concluded that a reasonable jury could consider the Plaintiff's camisole to

---

[12] This is the well-established doctrine of qualified immunity, which "provides 'that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Champion*, 380 F.3d at  900 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)).

[13] The Fourth Amendment's prohibition against unreasonable searches is incorporated against the States by the Fourteenth.  *See Centanni v. Eight Unknown Officers*, 15 F.3d 587, 590 (6th Cir. 1994).

be underwear, the Court turns to the question of whether, viewing the facts in the light most favorable to the Plaintiff, the search was unreasonable.

### a. Misdemeanor Arrestees have a Reasonable Expectation of Privacy in their Bodies

It is "axiomatic . . . that people harbor a reasonable expectation of privacy in their 'private parts.'" *Justice*, 961 F.2d at 191 (citation omitted).  Although the level of privacy that pretrial detainees reasonably can expect is quiet modest, it is nevertheless real, particularly when one is only arrested for a non-violent misdemeanor.  *See Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir. 1989); *see also generally Bell v. Wolfish*, 441 U.S. 520 (1979).  It assuredly extends to one's private parts.  *See Masters*, 872 F.2d at 1255; *see also N.G. ex rel. S.C. v. Connecticut*, 382 F.3d 225, 232 (2d Cir. 2004) ("In several decisions, we have ruled that strip searches may not be performed upon adults confined after arrest for misdemeanors, in the absence of reasonable suspicion concerning possession of contraband. . . . As far as we can tell, all the circuits to have considered the issue have reached the same conclusion . . . ." (collecting cases)).

### b. Whether the Expectation of Privacy in One's Body Extends to Underwear

It is equally clear that this reasonable expectation of privacy in one's body applies even when one is wearing underwear.  The distinction between a full strip search and a strip search down to one's underwear is of "degree, rather than . . . kind." *Brannum v. Overton County Sch. Bd.*, 516 F.3d 489, 495 (6th Cir. 2008); *see also Safford Unified Sch. Dist. #1 v. Redding*, 129 S. Ct. 2633, 2641 (2009) ("Savana's claim that extending the search . . . to the point of making  her pull out her underwear was constitutionally unreasonable.  The exact label for this final step in the intrusion is not important, though strip search is a fair way to speak of it."); *Wood v. Hancock County Sheriff's Dep't*, 354 F.3d 57, 63 n.10 (1st Cir. 2003) ("[A] strip search may occur even when an inmate is not fully disrobed."); *State v. Jones*, 796 N.E.2d 989, 995 (Ohio Ct. App. 2003) ("[Ohio law] defines a 'strip search' as 'an inspection of the . . . undergarments of a person that is preceded by the removal or rearrangement of some or all of the

11

person's clothing that directly covers the . . . undergarments and that is conducted visually . . . ." (citing O.R.C. 29[3]3.32(A)(1))).[14]  There can be no question, then, that misdemeanor arrestees have a reasonable expectation of privacy in their underwear-clad bodies.

### c.  A Reasonable Jury Could Consider the Plaintiff's Camisole to be Underwear

The Defendants do not dispute the above propositions of law.  The debate in this case, rather, is a factual one: whether the Plaintiff's lace-trimmed camisole should be considered underwear.  The Defendants' claim that it should not (*e.g.*, Doc. 53-3 at ¶ 11), whereas the Plaintiff claims that it should (Doc. 54-1 at ¶¶ 11-12).[15]  Viewing the facts in the light most favorable to the non-moving party, as the Court must, however, it is evident that a reasonable jury could find the clothing in question to be underwear.  *See Menashe v. V Secret Catalogue, Inc.*, 409 F. Supp. 2d 412, 417 (S.D.N.Y. 2006) ("The collection, characterized as 'fun, flirty, and playfully sexy,' was designed to appeal to women in their twenties and early thirties, and was comprised of over eighty items that included panties, camisoles, and other underwear."); *St. Eve Int'l, Inc. v. United States*, 27 C.I.T. 758, 766 (Ct. Int'l Trade 2003) ("[C]ertain knit, tank-styled garments [are] classifiable as underwear . . . ."); *State v. Foran*, Case No. CR040216603, 2006 Conn. Super. LEXIS 3007, at *4 (Conn. Super. Ct. Oct. 5, 2006) ("[The] underwear set . . . consisted of a tank top and thong panties."); *cf. Anheuser-Busch v. Teamsters, Local 633*, Case No. 74-238 1974 U.S. Dist. LEXIS 7102, at *2 (D.N.H. 1974) ("As I understand it, a tank-top shirt is an underwear shirt . . . . [that several employees were wearing as outerwear]"), *rev'd on other*

---

[14] The Plaintiff herself does not use the terminology "strip search" to describe the events of May 26, 2007.  (Doc. 53-11 at 60:11-17.)  Although perhaps a problematic fact at trial, this has no relevance on summary judgment, where the question is the legal definition of strip search, rather than its conventional usage.  What is relevant here is that the Plaintiff considers herself to have been photographed and searched in her underwear, and, as discussed below, a reasonable jury might agree with that characterization.

[15] The Defendants do not claim that only the bottom layer of clothing could ever be considered underwear.  To the contrary, Officer Smith testified that he considers a woman's slip to be underwear (*see* Doc. 54-9 at 27:23-28:7), and the Defendants' briefing strongly implies that they understand that at least some camisoles are properly classified as underwear.

*grounds*, 511 F.2d 1097, 1100 (1st Cir. 1975) ("We are mindful of the repeated concessions of both parties that the underlying dispute on the wearing of tank-tops [as outerwear] is an arbitrable one."); *but see, e.g.*, *Twp. of Bainbridge v. Kaseda*, 2008 Ohio 2136, ¶6 (Ohio Ct. App. May 2, 2008) ("[A]ppellant was wearing a tank top <u>and</u> underwear." (emphasis added)).[16]  In other words, because a reasonable jury could conclude that the Plaintiff was photographed and searched in her underwear, the Court's analysis on summary judgment must view the events of this case in that light.

### d.  Construing the Facts in the Light Most Favorable to the Non-Moving Party, this Search was Unreasonable

A number of courts have observed that one "charged only with a traffic violation or nonviolent minor offense may not be subjected to a strip search unless there are reasonable grounds for believing that the particular person might be carrying or concealing weapons or other contraband."  *Masters*, 872 F.2d at 1255; *see also Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991) ("[M]isdemeanor arrestees have a right, absent a particularized suspicion . . . not to be subjected to strip searches by prison officials." (citing *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986)).  Every search is different, however, and to determine whether a particular search of a pretrial detainee is reasonable, a court should:

> Balance[] . . . the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it occurred.

*Mills v. City of Barbourville*, 389 F.3d 568, 578 (6th Cir. 2004) (*quoting Bell*, 441 U.S. at 559.)

Viewing the facts in the light most favorable to the non-moving party, this case does not present a close call.[17]  As an initial matter, assuming the Plaintiff was reduced to her underwear, that action was highly intrusive in scope, even if not as intrusive as removing all of the Plaintiff's clothing.  *Safford*, 129

---

[16] As of March 9, 2010 at 7:30 pm, Google's first result in response to the search "camisole tank top" is for an article of "lingerie."

[17] The facts of this case themselves, of course, do: a reasonable jury may or may not consider this particular laced-trimmed camisole to have been worn as underwear on that particular night.  But this is a factual question, not a legal one.

13

S. Ct. at 2641; *Brannum*, 516 F.3d at 495.  Taking a photograph of the Plaintiff in this state, one that is now publically available, was essentially the *most* invasive manner in which this search could have been conducted.  As problematically, the Defendants assert no justification for photographing the Plaintiff in this state whatsoever.[18]  Although a jail is, generally, a particularly reasonable place to conduct a search, the presence of a publically available photograph of the Plaintiff in her underwear negates this factor.

---

[18] The Defendants do argue that:

> A law enforcement officer may conduct a <u>full search</u> of an arrestee incident to a lawful arrest under the "search-incident-to-a-lawful arrest exception to the Fourth Amendment." . . . A custodial arrest based on probable cause is reasonable under the Fourth Amendment.  Because the intrusion is lawful, the search requires no additional justification.

(Doc. 53 at 14-15 (emphasis added).)  This statement is not exactly correct. On one hand, the ability of officers to perform a <u>reasonable</u> search of an individual incident to a lawful arrest is well-established. *Cf. United States v. Thomas*, 512 F.3d 383, 389 (7th Cir. 2008) ("[T]he pat-down search incident to arrest was reasonable in scope, manner and justification.").  On the other, even the Defendants seem to acknowledge that not every search incident to arrest is reasonable: of particular relevance here, it is well-established that one may not strip search a non-violent misdemeanor arrestee absent particularized suspicion. *Masters*, 872 F.2d at 1255.

> Officer Jones justified the need to take the photograph of the Plaintiff in her camisole as follows:
>
> QUESTION:   Why was Christine Jones asked to remove her outer garment before the photo?
>
> ANSWER:     She hadn't been searched yet. We were waiting for a female officer to come back and search her. It had to be taken off prior to her being searched.
>
> QUESTION:   While you were waiting, you couldn't have taken her photo with it on?
>
> ANSWER:     I guess I didn't -- could we have taken the photo with it still on?
>
> QUESTION:   Yes.
>
> ANSWER:     We could have, yes.  But that would defeat the purpose of the -- as much of the search as we can do before the female officer gets back there.  We take away as much as we possibly can from them until the female gets back there.
>
> . . . .
>
> QUESTION:   Why couldn't the booking photo wait until after she was given her jacket back?
>
> ANSWER:     Because the booking process -- we were waiting for the female dispatcher to come back.  We have to get the booking process done as quick as possible.  We

14

The Defendants do contend that a thorough pat-down search requires them to remove an arrestee's outer layer of clothing so long as that clothing is not covering underwear.  This justification does not help them here, however.  First, as noted above, a reasonable jury could conclude that the Plaintiff's outer layer of clothing – which was form-fitting and light weight – was covering only underwear, and the Defendants accept the proposition that a pat-down search of a misdemeanor arrestee in her underwear is unreasonable absent particularized suspicion that she is harboring contraband.  (*See*, *e.g.*, Doc. 54-10 at 25:7-10 ("QUESTION: Are there any situations where you wouldn't . . . remove[] . . . outer clothing?  ANSWER: Only if there was nothing underneath them, or undergarments directly underneath them.").)  Second, this justification applies only to the pat-down itself, not to the booking photograph.  The Defendants do not assert, for example, that there is a special need to remove outerwear for booking photographs, nor, in light of the current record evidence, could they do so credibly.  (*See* Doc. 54-4 at 6-9 (containing the booking photographs of three men in baggy sweatshirts and one man in a jacket, in which three of those four men are clearly wearing a t-shirt under that clothing).)  The Defendants' protestations to the contrary notwithstanding, when the facts are viewed in the light most favorable to the non-moving party – i.e., that the Plaintiff was told to submit herself to being photographed and searched in her underwear – it is clear that this search was unreasonable.

---

were shorthanded and we had to start the booking process as soon as we got in there, and the female dispatcher was all tied up.

(Doc. 54-10 at 27:9 – 29:3.)  The video reveals, however, that it took the Plaintiff seconds to remove the clothing once she was told that she would have to do so, indicating that she could have waited for the pat-down search to begin before taking off her hoodie without unduly delaying the booking process. (Doc. 54-3.)

### 2.   The Propriety of Recovery Against Any Particular Defendant

#### a.   Officer Jones and Officer Smith (Personal Capacity)

##### i.   The Meaning of "Personal Capacity"

The Defendants argue that the Plaintiff cannot recover against Officer Jones or Officer Smith because she has not properly pled claims against them in their personal, as opposed to official, capacities.  The Defendants argue:

> [The Plaintiff's] Second Amended Complaint identified . . . Officer Jones [and] Officer Smith . . . in their official and personal capacities. . . . [The Plaintiff] must have evidence to support her claim that the officers were acting within their personal capacity.  Both Officer Jones and Officer Smith testified that they were working as police officers on the night of [the Plaintiff's] arrest. . . . [There is no] evidence to support a claim [that the] officers were acting in their *personal* capacities.

(Doc. 57 at 6) (emphasis in original).  The Defendants are misguided: there is no requirement that the Plaintiff "have evidence to support her claim that the officers were acting within their personal capacity."  The Sixth Circuit has explained the distinction between personal and official capacity:

> [P]ublic officials in their individual capacities . . . are considered persons for the purposes of suits brought under § 1983, even when they are carrying out government functions. Personal liability against a state official can be established under § 1983 by showing that the official, acting under color of state law, caused the deprivation of a federal right.

*Gean v. Hattaway*, 330 F.3d 758, 766 (6th Cir. 2003) (citations and quotation marks omitted).  A "personal capacity" claim is appropriate to the extent the Plaintiff can show that, while acting under color of law, Officer Smith and Officer Jones caused the deprivation of a clearly established federal right in an objectively unreasonable manner.  The Plaintiff must show nothing else.

##### ii.   Qualified Immunity

As previously discussed, individual officials will not be held liable under § 1983 unless those officials violated the plaintiff's "clearly established constitutional rights" in a way that was "objectively unreasonable in light of [those] clearly established constitutional rights."  *Williams*, 186 F.3d at 691; *see also Champion*, 380 F.3d at 901 (citation omitted).  The Defendants assert that, even assuming a

16

reasonable jury could conclude that the Plaintiff's constitutional rights were violated, Officer Jones and Officer Smith are nevertheless entitled to qualified immunity on the Plaintiff's claim regarding "the pat-down search and all booking procedures."  (Doc. 53 at 14.)  The Defendants are mistaken.

As an initial matter, a close reading of the Defendants' motion reveals that it is not a typical assertion of qualified immunity.  The Defendants do not contest that, prior to May 26, 2007, it was clearly established that reducing someone to their underwear constitutes a strip-search and that to do so to a non-violent misdemeanor arrestee without particularized suspicion is a constitutional violation.  *Cf. Jones*, 796 N.E.2d at 995 ("[Ohio law] defines a 'strip search' as 'an inspection of the . . . undergarments . . . .'" (citing O.R.C. 29[3]3.32(A)(1))).[19]  *Rather, they dispute whether the Plaintiff was strip-searched at all*: they assert that the lace-trimmed camisole was not being worn as underwear:

> The tank top is not an undergarment and she did not consider herself to be left in her underwear after removing [her hoodie].  Her [hoodie] did not directly cover . . . undergarments . . . .  [The Plaintiff] removed her [hoodie] and had a tank top on underneath it.  The search did not remove any clothing directly covering . . . undergarments.  Officer Jones and Officer Smith's conduct did not violate any clearly established constitutional law . . . because [it] was not a strip search. . . . [The Plaintiff] cannot prove that the Officers' conduct violated any constitutional right.  Even if [the Plaintiff] could prove that the Officers' actions violated a constitutional right, that right was not clearly established.

---

[19] Although not cited by the Defendants, there is caselaw from the Eighth Circuit indicating that "strip searches requiring a person to disrobe completely have a uniquely invasive and upsetting nature" and are therefore distinguishable from strip searches involving only underwear.  *See Smook v. Minnehaha County*, 457 F.3d 806, 812 (8th Cir. 2006).  While it is surely true that not all strip searches are equally invasive, *see Brannum*, 516 F.3d at 495, the reasoning in *Smook* does not aid the Defendants here.  First, the *Smook* court's citation for this quote, to then-Judge Sotomayor, does not stand for the asserted proposition at all.  *See N.G. ex rel. S.C. v. Connecticut*, 382 F.3d 225, 239 (2d Cir. 2004) (Sotomayor, J., dissenting) (making no distinction between various forms of strip searches).  Second, *Smook* is explicitly limited to juveniles.  457 F.3d at 813 ("Our court, like many others, had concluded that a strip search of adult offenders without individualized suspicion was unreasonable, but those cases did not consider the different interests involved when the State has responsibility to act *in loco parentis*.").  Finally, viewing the facts in the light most favorable to the non-moving party, the intrusion here is <u>much</u> less reasonable than that described in *Smook*, because these Defendants photographed the Plaintiff in what a reasonable jury could conclude was her underwear, without any asserted justification for doing so.

(Doc 53 at 16; *see also* Doc. 53-1 at ¶ 53 ("[P]risoners must remove outer layers of clothing as long as it does not reveal an undergarment . . . .").)  Although the Defendants couch their argument in the language of qualified immunity, and although the Defendants may ultimately prevail upon this point, whether the Plaintiff was searched in her underwear is a factual question for the jury, not a legal question for a judge.  *Champion,* 380 F.3d at 900 ("[W]here the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.").[20]

For the sake of completeness, however, the Court observes that there can be no question that the Fourth Amendment rights at issue were clearly established as of May 26, 2007.  The Sixth Circuit first denied qualified immunity on the precise issue presented by this case over twenty years ago:

> It was clearly established on October 21, 1986, that a pretrial detainee has the right not to be searched unless the reasonableness of such a search is established by a balancing of the need for the particular search against the invasion of personal rights that the search entails.  It was equally clearly established that a person charged only with a traffic violation or nonviolent minor offense may not be subjected to a strip search unless there are reasonable grounds for believing that the particular person might be carrying or concealing weapons or other contraband. The strip search of [the Plaintiff] as set forth in the complaint failed the standard of objective reasonableness.  Thus, the defendants are not entitled to prevail at this stage of the case on their claim of qualified immunity.  The district court correctly denied the motion to dismiss insofar as it related to the Fourth Amendment claim based on the strip search.

*Masters*, 872 F.2d at 1255 (citations, emphasis, and quotation marks omitted).[21]

---

[20] The Defendants assertion that the Plaintiff "did not consider herself to be left in her underwear" after removing her hoodie is based entirely on the fact that the Plaintiff characterized what she was wearing as a "tank top" during her deposition.  Even setting aside that, as discussed above, tank tops can be considered underwear, the fact that the Plaintiff objected to removing her hoodie when asked to do so (Doc. 53-11 at 50:19-22), her body language on the video – i.e., using her arms to cover herself (Doc. 54-2), and her testimony that she felt "violated" and "disgusted" by the booking process (Doc. 53-11 at 62:22-63:-24), would all support a contrary conclusion by reasonable jurors.

[21] The Defendants' Motion for Summary Judgment does argue that their conduct is not as bad as the conduct described in *Fann v. City of Cleveland*, 616 F. Supp. 305, 308 (1985).  (Doc. 53 at 15-16.)  While true, it is unclear why the Defendants consider this relevant and the Court can see no reason it would be so: *Fann* does not purport to establish the minimum constitutional intrusion necessary for liability.  *See, e.g.*, *Mills*, 389 F.3d at 578 (setting forth the test to determine whether a particular search is reasonable under the Fourth Amendment).

To prevail over a claim of qualified immunity, however, it is not enough that a plaintiff show that a right was clearly established.  A plaintiff must also "offer[] sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Champion*, 380 F.3d at 901 (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).  In this case, however, the answer to that question turns on the same disputed issue of fact at the heart of the Plaintiff's claim: whether the Defendants did or did not search and photograph the Plaintiff in her underwear.  In light of the clearly established law that performing a strip search on a non-violent misdemeanor arrestee without particularized suspicion is a constitutional violation, *see Masters*, 872 F.2d at 1255, and that a search in one's underwear is of the same character as a strip search for constitutional purposes, *see Wood*, 354 F.3d at 63 n.10, if the Defendants did so to the Plaintiff – photographing her in the process – it was objectively unreasonable.[22]  As previously noted, the Defendants may ultimately persuade a jury that the Plaintiff was not reduced to her underwear and, thus, not strip-searched, but that possibility does not allow them to prevail at this stage of the litigation. *Champion,* 380 F.3d at 900.

In sum, if a jury concludes that Officer Jones and Officer Smith photographed and searched the Plaintiff in her underwear, those officers will have violated clearly established law in an objectively unreasonable manner.  *See Masters*, 872 F.2d at 1255.  Consequently, Officer Jones and Officer Smith may not assert qualified immunity at this time.[23]

---

[22] It is likely that a plaintiff would not be able to show that a defendant's actions were "objectionably unreasonable," for example, if a female officer had, privately, performed a pat-down search of a woman wearing baggy clothing over a tank top or camisole.  The Court need not consider this, however, because that is not this case: the Plaintiff was wearing a form-fitting garment over her camisole, male Defendants photographed the Plaintiff in that camisole and were present during her search in that camisole, and Defendants have advanced no justification for this other than their own opinions that the Plaintiff's camisole was not underwear.

[23] Because this determination turns on a disputed issue of fact, rather than on any legal question, the Defendants are not entitled to take an interlocutory appeal from this order. *Johnson v. Jones*, 515 U.S. 304, 319-320 (1995) ("[A] defendant, entitled to invoke a qualified immunity defense, may not

### iii.  Summary Judgment is Inappropriate

Viewing the facts in the light most favorable to the non-moving party, Officer Jones and Officer Smith subjected the Plaintiff to a strip-search that included taking a photograph of the Plaintiff in her underwear while acting under the color of state law.  If a jury concludes that they did so, their actions were in violation of the Plaintiff's Fourth Amendment rights as incorporated against the states by the Fourteenth Amendment.  So, too, such a violation would contravene  clearly established law of which a reasonable person would have known, and would be objectively unreasonable in view of those rights. Accordingly, summary judgment is **DENIED** as to Officer Jones and Officer Smith on this claim.

### b.  Chief Carl DeForest and Sergeant David Szuter (Personal Capacity)

It does not appear that the Plaintiff attempts to sustain her claims against Chief DeForest or Sergeant Szuter in their personal capacities.  Rather, the Plaintiff claims that the City of Brunswick is liable in part because of Chief DeForest and Sergeant Szuter's actions and inactions.   Summary judgment is **GRANTED** as to Chief DeForest and Sgt. Szuter on this count.

### c.  City of Brunswick & Official Capacity Claims[24]

### i.  When a Municipality May be Held Liable

There is no vicarious liability under § 1983 for the alleged torts of a municipality's agents. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-94 (1978).  The doctrine of respondeat superior, therefore, is inapplicable in § 1983 actions – mere employment of an individual does not make the municipality liable for the allegedly unconstitutional acts of that individual.  *Id.*  A plaintiff must show, instead, that the municipality proximately caused the constitutional violation:

---

appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial."); *Brown v. Metcalf*, Case No. 08-4629, 2010 U.S. App. LEXIS 3832, at *4-5 (6th Cir. Ohio Feb. 24, 2010) ("[W]e do not have jurisdiction to entertain such an appeal because it turns on a disputed factual issue, not on an issue of law.").

[24] "[A]n official capacity suit [is] a suit against the municipality itself."  *Jorg v. City of Cincinnati*, 145 Fed. Appx. 143, 146 (6th Cir. 2005) (citing *Leach v. Shelby County*, 891 F.2d 1241, 1245 (6th Cir. 1989)).

> It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983.

*Monell*, 436 U.S. at 69; *see also Board of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.") (citation omitted). Simply put, to impose § 1983 liability upon a local government body, a plaintiff must show that the municipality itself is the wrongdoer. *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992).

Liability against a municipality is available under five theories: (1) express municipal policy, *Monell*, 436 U.S. at 660-61, (2) "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law," *City of St. Louis v. Praprotnick*, 485 U.S. 112, 127 (1988) (citation omitted), (3) the decision of a person with final policy making authority, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986), (4) the failure to act where the "inadequacy [of the existing practice is] so likely to result in the violation of constitutional rights, that the policymaker . . . can reasonably be said to have been deliberately indifferent to the [plaintiff's rights]," *City of Canton v. Harris*, 489 U.S. 378, 390 (1989),[25] or (5) ratification by a municipality of its employee's unconstitutional acts by failing to meaningfully investigate and punish allegations of unconstitutional conduct, *Fuller v. City of Oakland*, 47 F.3d 1522, 1535 (9th Cir. 1995); *see also Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989); *Wright*, 138 F. Supp. 2d at 966 ("[Plaintiff] can establish his municipal liability claim by showing . . .

---

[25] This category includes deliberately indifferent training or supervision, *Canton*, 489 U.S. at 390; *see also Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006), deliberately indifferent hiring, *Brown*, 520 U.S. at 410-11; *see also Doe v. Magoffin County Fiscal Court*, 174 Fed. Appx. 962, 967 (6th Cir. 2006), and deliberately indifferent failure to adopt policies necessary to prevent constitutional violations, *Conn v. City of Reno*, 572 F.3d 1047, 1064 (9th Cir. 2009); *see also Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992).

[that] a final municipal policymaker approved an investigation . . . that was so inadequate as to constitute a ratification of their alleged use of excessive force.").[26]

### ii.    Whether the Plaintiff can Establish Liability

The Plaintiff asserts that municipal liability should apply under any of three theories: express policy (*see* Doc. 54 at 22-23), official custom (*see id.*), or deliberately indifferent training or supervision (*see id.* at 25-26).

As an initial matter, she does not point conclusively to any particular policy on the part of the municipality that she asserts led to the deprivation of her constitutional rights.  To the contrary, the City of Brunswick has a very clear policy against strip-searching misdemeanor arrestees without a particularized reason to do so:

> [Strip] searches will only be conducted when there is probable cause or reasonable suspicion that a prisoner may be concealing evidence of the commission of a criminal offense . . . contraband, or a deadly weapon.  Sensitivity to the dignity of the prisoner by an officer . . . of the same sex will be maintained in all instances.  The search will be conducted in an area not visible (or potentially so), to persons other than the officer(s) conducting the search. . . . A strip search is an inspection of the genitalia, buttocks, breasts, or undergarments of a person that is proceeded by the removal or rearrangement of some or all of the person's clothing . . . .

(Doc. 53-7 at 4.)  Although this policy is somewhat unclear to the extent that it does not articulate whether a strip search should be performed upon reasonable suspicion or only upon probable cause, it very directly instructs against performing a strip search absent either.[27]

---

[26] Any two courts addressing municipal liability will undoubtedly employ three different frameworks in order to discuss it.  *Cf. Wright*, 138 F. Supp. 2d at 965 ("[T]he Court [must] delve into the sometimes murky jurisprudence of municipal liability under § 1983.")  Some panels of the Sixth Circuit, for example, use a framework that describes the failure to train as a type of custom or policy.  *See, e.g.*, *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009).  The Court believes, however, that the above framework is the most clear in this particular case.

[27] In large part because of the Defendants' questionable evidentiary submissions, discussed above, it is not clear whether the practice of removing an arrestee's outer layers of clothing prior to performing a pat-down search (so long as that clothing is not directly covering underwear) should be considered to occur pursuant to an official custom, express policy, or simply basic common sense.  Whatever the source of this practice, however, it very explicitly instructs officers <u>not</u> to remove outer

The Plaintiff next appears to argue that there was a wide-spread custom of ordering female arrestees to remove clothing without due regard to what was underneath that clothing.  In support, the Plaintiff has produced booking photographs of several women in what might reasonably be described as underwear, as well as men photographed in fairly heavy outerwear.  (*See* Doc. 54-4.)  The Court would have expected the Defendants to respond with booking photographs of at least *some* women who were clearly wearing shirts over camisoles or other revealing garments, but they did not, which certainly raises the possibility that no such booking photographs exist.  Because the Plaintiff has offered no evidence regarding what those other detainees were or were not wearing before their booking photos, or whether they were directed to remove any outerwear, however, the Court cannot say that this particular plaintiff has developed the record to the point where she can sustain her assertion of wide-spread custom.  If an action for municipal liability can be sustained in this case, then, it must be for the failure to adequately train or supervise employees.

A reasonable jury could so conclude.  Although the City of Brunswick expressly forbids performing a strip-search of an arrestee absent a particularized reason to do so and implicitly forbids photographing an arrestee in the course of such a search, viewing the facts in the light most favorable to the non-moving party, that is precisely what occurred in this case, and there is sufficient evidence to allow a reasonable jury to conclude that this occurred because of deliberately indifferent training or supervision.  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.").  First, Officer Jones testifies that he "does not recall" his training regarding the policy of removing outer garments prior to a search because it took place "nine years ago."  (Doc. 54-10 at 22.)  In response to questioning as to

---

layers of clothing directly covering underwear.  It cannot, accordingly, be the source of the alleged deprivation of the Plaintiff's rights.

whether he had ever been trained on the City of Brunswick's strip search policies, he said only that he had "reviewed all the policies . . . probably [nine years ago]," but at no time since then.  (*Id*. at 25:11-24.)[28]

Officer Smith, for his part, testified similarly, indicating that it had been ten years since he was trained to remove the outer garments of prisoners and that he was not sure when, after that time, he had reviewed the City of Brunswick's policies and procedures:

QUESTION:  . . . .  What is the source of the policy which you allege justified ordering Christine Jones to remove her shirt during her intake on May 26, 2008?

ANSWER:    The Brunswick Division of Police policies and procedures.

QUESTION:  Which policy?

ANSWER:    The policy referring to performing thorough pat-down searches.

. . . .

QUESTION:  Do you have any idea what that policy actually says?

ANSWER:    No.  Word for word, no.

QUESTION:  How about the gist?

ANSWER:    The gist is that a thorough pat-down search would be conducted of any and all prisoners who enter the Brunswick City Jail.

QUESTION:  Is there somewhere in that policy that defines what "thorough" is?

ANSWER:    No.

. . . .

QUESTION:  . . . .  Why do you think that removing outer layers of clothing is included in that policy?

. . . .

---

[28] In other words, if Officer Jones has *ever* received formal training on the City of Brunswick's strip-search policy, he does not appear to remember that training.

ANSWER:     I don't know where else it would be included.  It should be included with the policy referring to performing pat-down searches.  Our training, our procedures –

. . . .

QUESTION:  What training?  Who told you that removing outer layers of clothing was part of that thorough pat-down search?

ANSWER:     That would be my field training officers [ten years ago].

. . . .

QUESTION:  Have you reviewed [the City of Brunswick Division of Police Procedures] since 1999?

ANSWER:     I'm sure I have.  I can't tell you when.

(Doc. 54-9 at 12:10 – 15:8; *see also id.* at 17:12-23 ("QUESTION: . . . .  Now, you've been trained that it's a good idea to have [arrestees] remove their outer layers of clothing, or you've been trained that it's the City of Brunswick policy to remove their outer layers of clothing?  ANSWER: I have been trained that that is the way we do it.  QUESTION: But no one ever told you it's the City of Brunswick's policy?  ANSWER: In specific words, I don't know.").)

Finally, both Chief DeForest and Sergeant Szuter attest that Officer Jones and Officer Smith "complied with all of the City of Brunswick Police Department's policies and procedures" (Doc. 53-5 at ¶ 9; Doc. 53-4 at ¶ 9), implying that they too believe that the removal of outerwear without regard for what is underneath is appropriate.  This cumulative testimony is more than enough to allow a reasonable jury to conclude that, if a constitutional violation occurred, it occurred because Officer Jones and Officer Smith were so poorly trained regarding the City of Brunswick's pat-down and strip-search policies and clearly established law regarding the scope of permissible searches of misdemeanor non-violent

detainees, their lack of training amounted to deliberate indifference to the rights of the Plaintiff.[29]

Accordingly, the Defendants' Motion for Summary Judgment on this count is **DENIED**.

### B.  The Alleged Right to Privacy Violation

#### 1.  Whether the Plaintiff Suffered a Deprivation of a Constitutional Right

The Plaintiff claims that the publication of her booking photograph violates her constitutional right to privacy.  Although neither party addresses the controlling legal standard in briefing, the Sixth Circuit recently reiterated the contours of a claim that this right has been violated:

> Two types of interests have been identified  by the Supreme Court as protected by the right to privacy that is rooted in the substantive due process protections of the Fourteenth Amendment.  One is the interest in independence in making certain kinds of important decisions.  The other type of privacy interest applicable to individuals is the interest in avoiding disclosure of personal matters.  [The Plaintiff's] claim implicates the latter interest, which this court has described as an individual's right to control the nature and extent of information released about that individual and that has been coined an informational right to privacy.

*Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008) (quoting *Bloch v. Ribar*, 156 F.3d 673, 683 (6th Cir. 1998) (quotation marks and other citations omitted).  The claim made by the Plaintiff in this action, then, must be understood as one that the Defendants violated her "informational right to privacy."  *Id.*

The informational right to privacy is a narrow one, but it does protect information "of a sexual, personal, and humiliating nature."  *Lambert*, 517 F.3d at 440.  Where such information is concerned, a Court must "balance the government's interest in disseminating the information against the [Plaintiff's] right to informational privacy" to determine whether the informational right to privacy has been violated.  *Bloch*, 156 F.3d at 685.

---

[29] Surprisingly, in the face of this evidence, Defendants do not proffer any evidence regarding the scope, nature, and regularity of training officers may or may not have received regarding the proper manner and means of conducting searches of non-violent misdemeanor arrestees, or of conducting the attendant booking photo process.  While Plaintiff certainly bears the burden of proof on this issue, at the summary judgment state, Plaintiff is charged with responding to "well-supported motion[s]."  *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  The Court cannot recall another case in which a municipal defendant failed to offer any proof regarding the training incurred by its offices as to the practice in question.

### a.   Whether the Plaintiff's Photograph is Protected

As previously explained, the Defendants do not attempt to show that they did not violate this standard.[30]  They do make three arguments worthy of brief treatment, however.  First, the Defendants open both their motion for summary judgment and their reply brief by proclaiming that "[t]here is no right to privacy found in any specific guarantee in [the] Constitution."  (Doc. 53 at 21; Doc. 57 at 12.)  While true, this misses the mark.  The Defendants are before a district court: to the extent that the Defendants are attempting to argue that there is no constitutionally protected "interest in avoiding disclosure of personal matters," *Lambert*, 517 F.3d at 440, they must make that argument elsewhere.[31]

Second, they argue that "there is no fundamental right of privacy regarding a booking photograph."  (Doc. 53 at 22.)  This mischaracterizes the question.  The issue is not a right to privacy in booking photographs generally, but whether there is a right to privacy that prevents the dissemination of a photograph of the Plaintiff in her underwear.  The Defendants cannot possibly intend to suggest, for example, that they could take naked pictures of arrestees without implicating the informational right to privacy so long as they referred to such pictures as "booking photographs."  *Cf. Brannum*, 516 F.3d at

---

[30] The Defendants cite a single case in their brief, *Paul v. Davis*, 424 U.S. 693 (1976).  That citation is inapposite.  In *Paul*, the Supreme Court explained that the Fourteenth Amendment does not "make actionable many wrongs inflicted by government employees which had heretofore been thought to give rise only to state-law tort claims," nor make "an injury to reputation . . . actionable under § 1983 and the Fourteenth Amendment even if other such harms are not."  *Id*. at 699.  *Paul* explains that there is "no constitutional doctrine converting every defamation by a public official into a deprivation of liberty."  *Id*. at 702.  Nothing in *Paul* undermines the Sixth Circuit's later observation that "[t]wo types of interests have been identified by the Supreme Court as protected by the right to privacy that is rooted in the substantive due process protections of the Fourteenth Amendment." *Lambert*, 517 F.3d at 440 (quoting *Bloch*, 156 F.3d at 683).

[31] In context, it seems unlikely Defendants are urging this point.  Rather, it appears that the Defendants were unaware that the right to privacy extends not only to "independence in making certain kinds of important decisions," but also to "the interest in avoiding disclosure of personal matters."  (*See* Doc. 53 at 21 ("Personal privacy [is] limited to certain fundamental rights that are implicit in the concept of ordered liberty.  These fundamental rights include[] marriage, procreation, contraception, family relationships, child rearing, and education.").)

27

495 (explaining that the distinction between a full-body strip search and a strip-search to one's underwear is of degree, rather than kind).

Third, the Defendants argue that there is no right to privacy in "the publication of an official act." (Doc. 53 at 21-22.) That is simply incorrect, referring to something as "an official act" does automatically shield officials from liability. Rather, when the Government disseminates information touching upon the informational right to privacy, a Court must "balance the government's interest in disseminating the information against the [Plaintiff's] right to informational privacy" to determine whether the informational right to privacy has been violated. *Bloch*, 156 F.3d at 685.

In sum, none of the Defendants' arguments are directed at the relevant question: whether a reasonable jury could conclude that the booking photograph was "of a sexual, personal, and humiliating nature." *Lambert*, 517 F.3d at 440. Because, as explained above, a reasonable jury could conclude that the photograph is one of the Plaintiff in her underwear, a reasonable jury could also conclude that the photograph is "sexual, personal, and humiliating."

### b. Whether the Governmental Interest Outweighs the Plaintiff's Privacy Rights

As explained above, the Defendants offer no justification for *taking* the photograph of the Plaintiff in a lace-trimmed camisole. It need hardly be said, then, that they offer no justification for *publishing* that photograph. Although there is assuredly a legitimate governmental interest in making booking photographs a part of the public record, that general interest does not protect the Defendants here, where even the Defendants themselves do not assert any particular reason for taking these particular photographs. To the extent, then, that a jury concludes that the photograph is of the plaintiff in her underwear, the Defendants have not presently attempted to show "a compelling state interest" in that publication. *Bloch*, 156 F.3d at 686.[32]

---

[32] The Defendants do argue in passing that the Plaintiff "has not offered any evidence that [the Defendants] published the booking photograph." (Doc. 53 at 22.) This argument is not well-taken: there is no dispute that the Defendants placed these photographs into the public record. Accordingly,

### 2.   The Propriety of Recovery Against Any Particular Defendant

The Defendants do not contest the propriety of recovery, on this claim, against any particular Defendant for purposes of summary judgment.  Most notably, the individual defendants do not raise the defense of qualified immunity,[33] no individual defendant declaims personal responsibility for the publication of the photograph, and the municipality does not contest either that it had a policy of publishing all booking photographs (including those of scantily-clad women) or that its policy was the proximate cause of any violation.  Rather, the Defendants implicitly concede for purposes of summary judgment that, to the extent a violation occurred, each of the individual defendants and the municipality itself are responsible for it.  The Defendants' Motion for Summary Judgment on the Plaintiff's right to privacy claims is, accordingly, **<u>DENIED</u>** as to all defendants.

### C.  Whether the Plaintiff can Sustain her Equal Protection Claim

The Plaintiff asserts that she was deprived of her right to Equal Protection under the Fourteenth Amendment because she was searched and photographed in her underwear due to her status as a woman. To show that she has suffered a deprivation of her right to equal protection, the Plaintiff must allege sufficient evidence that a reasonable jury would conclude that she was discriminated against because she was a woman, which is distinct from the allegation that she was treated unfairly as an individual. *Thorne v. Village of Sanford*, 793 F.2d 1293 (6th Cir. 1986) ("In order to state a claim for denial of equal protection, the alleged discrimination must be based on poverty, race, or some other classification; it is not enough that one individual was treated differently from another."); *see also Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006) ("The threshold element of an equal

---

there is no basis upon which the Defendants can argue that the Plaintiff has not met her burden on summary judgment.

[33] Qualified immunity would likely have been a very difficult assertion at this stage of litigation in any event: in 1998, the Sixth Circuit specifically stated that "public officials in this circuit [are] now . . . on notice that" the right to informational privacy exists with respect to personal sexual information. *Bloch*, 156 F.3d at 685.

protection claim is disparate treatment . . . .").  That notwithstanding, "a single discriminatory act against one individual can amount to intentional discrimination for equal protection purposes."  *Bohen v. East Chicago*, 799 F.2d 1180, 1186-87 (7th Cir. 1986) (citing *Batson v. Kentucky*, 476 U.S. 79 (1986)).  Of particular relevance, at the summary judgment stage, it is enough for a Plaintiff to present evidence that would allow a reasonable jury to conclude that she would not have suffered particular treatment, but for the fact that she was a female.  *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988); *see also Mary Beth G. v. Chicago*, 723 F.2d 1263, 1274 (7th Cir. 1983) ("[T]he policy of the City under which only the body cavities of female, but not male, arrestees were visually inspected violated the women's rights to equal protection."); *Chivers v. Cent. Noble Cmty. Schs*, 423 F. Supp. 2d 835, 852 (N.D. Ind. 2006) ("[D]iscrimination and harassment against an individual woman because of her sex is a violation of the equal protection clause. . . . harassment based on sexual desire is . . . based on gender.").

This claim presents a close call: it is striking that the City of Brunswick has photographed a number of men in fairly bulky clothing and a number of young women in very limited clothing.  (*See* Doc 54-4.)  So, too, there can be little argument that it is unconstitutional to strip search women, but not men, or to strip search a particular woman because she is a woman.  *See Mary Beth G.*, 723 F.2d at 1274; *Chivers*, 423 F. Supp. 2d at 852; *Ford v. Suffolk County*, 154 F. Supp. 2d 131, 139 (D. Mass. 2001) ("[T]he policy or practice of conducting routine strip-searches and routine visual body cavity searches of women [and not men] is illegal and unconstitutional . . . .").  Nevertheless, the Plaintiff's proofs fall shy of a sustainable claim.  As noted above, pictures of five men in relatively bulky clothing and three other women in camisoles, without more evidence regarding the circumstances surrounding those photos, is not enough to allow a reasonable jury to conclude that certain men were not singled out for this treatment, that women were singled out for this treatment at a higher rate than men, or that the

Plaintiff was singled out for this treatment because the Defendants found her to be an attractive woman.[34]

Because the Plaintiff falls short of providing the type of evidence that would enable a reasonable jury to conclude that she was photographed and searched as she was because she was a female, the Defendants' Motion for Summary Judgment is **<u>GRANTED</u>** as to all defendants for this claim.

### D.  Whether the Alleged Deprivation of a Phone Call is Actionable Under § 1983

The Plaintiff asserts that she:

> was placed in a holding cell at approximately 2:44 am and not permitted to make a telephone call until approx. 3:29 am. . . . After being placed in a holding cell, she had to use the call button multiple times before an officer came to allow her use of the telephone. . . . This is contrary to Officer Jones presentation that he offered her use of a telephone and then came back to ask her again forty-five minutes later. . . . There is no evidence, besides Defendant Officer Jones' self-serving statement to support the contention that Christina Jones initially refused her telephone call. . . . [The] reasonableness of waiting for forty five minutes without allowing her to use the telephone is a matter for the finder of fact.

(Doc. 54 at 27.)  The Plaintiff's description of the evidence here is simply inaccurate.  At 2:43 am, Officer Jones can be seen on video offering the Plaintiff a phone call, which she does not accept.  (Doc. 53-1 at ¶¶ 16-22; Doc. 54-3.)  The Plaintiff does not claim (nor does it seem that she could) that it somehow violated her federal constitutional or statutory rights for the Defendants to wait 45 minutes after first offering her a phone call to give her a call, even assuming she immediately changed her mind about that call after being placed in the holding cell.  The Plaintiff, indeed, does not point to any alleged federal constitutional or statutory violation whatsoever.[35]  The Defendants' Motion for Summary Judgment is **<u>GRANTED</u>** for all defendants as to this claim.

---

[34] The Plaintiff submitted pictures of five women who were photographed in very limited clothing, but one of these women is wearing a shirt.  (*See* Doc. 54-4 at 4.)

[35] It appears, rather, that the Plaintiff contends that this was a violation of Ohio statutory law. Her state law claims, however, were struck from the pleadings.  (*See* Doc. 52.)

**E.  The Plaintiff's Remaining Claims**

The Defendants assert that they are entitled to summary judgment on the Plaintiff's claims under the Ninth and Fifth Amendments.  (*See* Doc. 53 at 22-23.)  The Plaintiff does not oppose the Defendants' motion as to those claims and the Court finds it well taken.  Accordingly, the Defendants' Motion for Summary Judgment with respect to these claims against all defendants is **<u>GRANTED</u>**.

Conversely, the Defendants attempt to bar the Plaintiff from obtaining injunctive relief, primarily on the basis that they assert that the Plaintiff cannot sustain any of her claims. (*See id*. at 25-26.) Because, as explained above, the Plaintiff can sustain a cause of action at this stage and may prevail at trial, it is not appropriate for this Court to bar any particular form of relief at this time.[36]   The Defendants' Motion for Summary Judgment to bar future injunctive relief is **<u>DENIED</u>**.

**VI. CONCLUSION**

For the aforementioned reasons, Defendants' Motion for Summary Judgment (Doc. 53) is **<u>GRANTED IN PART AND DENIED IN PART</u>**.

The Court neither approves of nor condones the Plaintiff's decision to drive while intoxicated. The Court is not asked, however, to address whether her arrest and detention were justified.  The Court, instead, addresses whether, once detained, the Plaintiff was deprived of the constitutional rights which are to be afforded to all non-violent misdemeanor arrestees.  The Court finds that Defendants, in large measure, are not entitled to judgment as a matter of law on that question.  Specifically, the Court finds

---

[36] The Court makes no finding on the appropriateness of injunctive relief, but observes that § 1983 plaintiffs, like all litigants, must have standing to obtain any particular form of such relief.  *See Fieger v. Mich. Supreme Court*, 553 F.3d 955, 966 (6th Cir. 2009) ("[W]here the threat of repeated injury is speculative or tenuous, there is no standing to seek injunctive relief." (citations and quotation marks omitted)); *Dodson v. Wilkinson*, 304 Fed. Appx. 434, 438 (6th Cir. 2008) ("[The Plaintiff] lacks standing to seek injunctive relief on behalf of all . . . inmates, and therefore his claims and arguments on appeal are limited to alleged violations of his own constitutional rights.").

that it is possible the Plaintiff may sustain her claims that the Defendants violated her right to be free from unreasonable searches and seizures under the Fourth Amendment against Officer Jones and Officer Smith in their personal capacities, against all individual defendants in their official capacities, and against the City of Brunswick.  The Plaintiff may also sustain her claim that the Defendants violated her informational right to privacy as provided by the Fourteenth Amendment against all Defendants.  So, too, the Plaintiff may ultimately be entitled to some form of injunctive relief if she can prove these claims.  The Defendants' Motion for Summary Judgment (Doc. 53) is **GRANTED** as to all other claims.

Trial is set for **August 9, 2010**.  A pretrial order will follow.


**IT IS SO ORDERED.**

           **s/Kathleen M. O'Malley**
           **KATHLEEN McDONALD O'MALLEY**
           **UNITED STATES DISTRICT JUDGE**


**Dated: March 26, 2010**